UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                                        :
YASSNA NATHALIE ABARZUA,                                 :
                                                        :
                                    Plaintiff,           :           16-cv-7594 (KBF)
                                                        :
              -v-                                        :           OPINION & ORDER
                                                        :
NANCY A. BERRYHILL, Acting Commissioner of :
Social Security,                                         :
                                                        :
                                    Defendant.           :
                                                        :
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 11, 2018

KATHERINE B. FORREST, District Judge:

Plaintiff Yassna Nathalie Abarzua seeks review of the decision by defendant Commissioner of Social Security ("the Commissioner"), finding that she was not disabled and not entitled to Social Security Disability ("SSD") benefits under Title II of the Social Security Act (the "Act"). Plaintiff filed for disability benefits based on a myriad of injuries: thirteen physical impairments, including back, knee, heart impairments, vertigo, hearing loss, hepatitis C, diabetes, hypertension and morbid obesity; and four mental impairments, including depression, bipolar disorder, anxiety disorder, and post-traumatic stress disorder ("PTSD").

Now before the Court are the parties' cross-motions for judgment on the pleadings. For the reasons set forth below, defendant's motion is GRANTED and plaintiff's motion is DENIED.

# I.  PROCEDURAL AND FACTUAL BACKGROUND

## A. Procedural Background

Plaintiff applied for SSD benefits on July 10, 2010.  (Tr. 360–63, 388–95.)[1] The Social Security Administration ("SSA") denied her claims.  Plaintiff then requested a hearing before an administrative law judge ("ALJ") which was held on June 17, 2011.  (Tr. 42–59.)  On November 4, 2011, the ALJ issued a decision finding that plaintiff was not disabled.  (Tr. 145–61.)  On April 25, 2013, the Appeals Council vacated the ALJ's decision and remanded the case for another hearing.  (Tr. 162–67.)  The plaintiff and her attorney appeared three additional times in a continued series of hearings on October 16, 2013 (Tr. 68–75), April 24, 2014 (Tr. 60–67), and June 19, 2014 (Tr. 76–143).  On April 7, 2015, the ALJ issued a second decision, again finding that plaintiff was not disabled.  (Tr. 12–40.)

The ALJ's 2015 decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on August 8, 2016.  (Tr. 1–7.)

## B. Factual Background

The Court recites only those facts relevant to its review.  A more thorough summary of plaintiff's medical history can be found in the parties' briefing and in the extensive administrative record.  The period at issue for this appeal is from July 10, 2010, the date on which plaintiff applied for SSA benefits, through April 7, 2015, the date of the ALJ's final decision.

---

[1] "Tr." refers to the pages of the administrative record filed by the Commissioner as part of her answer.

1. <u>Plaintiff's Personal History</u>

Plaintiff was born in 1971. (Tr. 144.) She completed ninth grade but did not graduate from high school or obtain a General Equivalency Degree. (Tr. 390.) Plaintiff was employed briefly from January through August of 2008, as a childcare provider for her neighbor. (Tr. 55.) Otherwise, she has not been employed.

Plaintiff was in prison from 2000–2001 for burglary. (Tr. 47.) She used heroin, crack cocaine, and cocaine from 1991 until March 2007, and during the relevant period was in a methadone program. (Tr. 47, 104, 568.)

Plaintiff is able to speak a little bit of English, but her preferred language is Spanish. (Tr. 80–81.) Through an interpreter, she testified that she is not able to read or write in English. (<u>Id.</u>)

At her hearings, plaintiff testified that she lived with her nineteen-year-old daughter. (Tr. 46–47.) She reported that she attended a methadone program on a daily basis; travel to the program involved changing subway lines twice and walking about four blocks. (Tr. 56–57.) In sum, her travel each way was about thirty minutes. (Tr. 56.) She reported that she would often stop at church on the way home. (Tr. 57.) She further testified to traveling to Puerto Rico for seven days in 2010 in order to attend to family matters. (<u>Id.</u>)

In her June 2011 hearings, she testified that it was difficult for her to lift more than five pounds and to stand or walk for long without rest. (Tr. 52–53.) She reported pain in her back, numbness in her legs, which made standing difficult, and

arthritis, which caused her to drop things. (Tr. 46.) In her June 2014 hearing, she

reported pain in her neck, low back, and right knee. (Tr. 82.)

      2.  <u>Plaintiff's Medical History</u>

        a.  <u>Plaintiff's Physical Health</u>

At the time of her application for benefits, plaintiff alleged that she had

dislocated discs and hepatitis C. (Tr. 389.) She was subsequently diagnosed with

several other medical conditions: bilateral carpal tunnel syndrome, right knee

anterior cruciate ligament ("ACL") partial tear, right knee grade II lateral collateral

ligament ("LCL") sprain, severe arterial narrowing, vertigo, hearing loss, diabetes,

uncontrolled hypertension, and morbid obesity. (ECF No. 17.)

Over the relevant period the plaintiff was examined by several doctors. The

Court will review each in turn.

First, on August 10, 2010, plaintiff was examined by consultative physical

Dr. William Lathan. (Tr. 571–74.) Dr. Lathan observed that plaintiff had a normal

gait, could walk on her heels and toes without difficulty, could perform a full squat,

and had a normal stance. (Tr. 572.) He noted that she was not in acute distress,

and that, though she carried a cane, she was able to walk without one, and did not

need help changing or getting on or off of the examination table. (<u>Id.</u>)

Dr. Lathan's examination showed a full range of motion in plaintiff's

shoulders, elbows, forearms, wrists, hips, knees, and ankles. (Tr. 573.) She had full

flexion, extension, lateral flexion, and rotary movement of both her cervical and

lumbar spine. (<u>Id.</u>) She had no scoliosis or other abnormalities in her thoracic

spine.  (Id.)  Her joints were stable and non-tender; straight leg raising ("SLR") was negative.[2]  (Id.)  Her neurologic examination showed that she had full strength in both her upper and lower extremities and that her deep tendon reflexes were physiologic and equal in her upper and lower extremities.  (Id.)  She had full grip strength and intact hand and finger dexterity.  (Id.)

As a result of his examination, Dr. Lathan found that plaintiff had a moderate restriction for prolonged standing, prolonged walking, lifting, pushing, pulling, and strenuous exertion.  (Id.)

On September 14, 2011, plaintiff had a magnetic resonance imaging (an "MRI") of her spine at Madison Avenue Radiology Center.  (Tr. 1170–71, 1305–08, 1650–53.)  The MRI of her cervical spine showed a mild disc bulge at C5-6, a straightening of the cervical spine, possibly due to muscle spasms, and no significant spinal stenosis or myelopathy.[3]  (Tr. 1170.)  The MRI of her lumbar spine showed multilevel bulges at L3-4, L4-5, and L5-S1, straightening of the lumbar spine, possibly due to muscle spasms, and no significant spinal stenosis or severe neural foraminal narrowing.[4]  (Tr. 1171.)  The physicians' assistant who ordered the MRI, Angela Rosenberg, PhD, noted that she responded well to medication and did not suggest surgery, and checked the box on the functional assessment form that indicated that plaintiff would be unable to work for at least 12 months.  (Tr. 1262.)

---

[2] The SLR is a test done to determine whether a patient with low back pain has an underlying herniated disk.
[3] Spinal stenosis refers to the narrowing of the spaces within the spine, which can put pressure on the nerves; myelopathy refers to any neurologic deficit in the spinal cord.
[4] Neural foraminal narrowing refers to the narrowing of the nerve passageways in the spine, often leading to compression or pinched nerves.

On November 10, 2011, plaintiff was examined by physical medicine and rehabilitation specialist, Dr. Robert Hecht.  (Tr. 1172–73.)  Dr. Hecht noted tenderness and a restricted range of motion in both the cervical and lumbar spine, and positive SLR, but no spasms and normal lordosis.[5]  (Tr. 1172.)  Hecht also observed a full range of motion and full strength in her shoulders, elbows, and wrists, intact sensation, and full reflexes in her triceps, biceps, and wrists.  (Id.)  He further observed that she had full range of motion and strength in both hips, knees, and ankles, intact sensation, and full reflexes.  (Tr. 1173.)  He diagnosed plaintiff with cervical and lumbosacral sprain-strain and disc bulges and recommended physical therapy.  (Id.)

Plaintiff sought care at the White Pines Medical Group in Rochester, New York, at a time when she relocated there temporarily.  (Tr. 1393–1425.)  She sought treatment between February and May 2013, at which time she left the practice when Dr. Daniel Koretz told plaintiff he would no longer prescribe controlled substances, due to the fact that she had not reported her methadone treatment after signing a controlled substance agreement.  (Tr. 1415.)

Plaintiff sought occasional care from Dr. David Khasidy starting in December 2012.[6]  (Tr. 1501.)  On January 6, 2014, he filled out a "multiple impairment questionnaire."  (Tr. 1501–07.) He diagnosed plaintiff with cervical and lumbar

---

[5] Lordosis refers to the normal inward curvature of the spine.

[6] Though Dr. Khasidy indicated on the questionnaire that he treated plaintiff monthly starting in December 2012, it appears that his regular treatment of plaintiff lasted from September 2013 until he filled out the questionnaire in January 2014.  On plaintiff's September 23, 2013 appointment with Dr. Khasidy, he noted that he had not seen her for nearly a year, as she had relocated to Rochester, New York.

spine radiculopathy with disc herniations, borderline carpal tunnel syndrome, hypertension, and an enlarged thyroid. (Tr. 1501.) He further noted that plaintiff had a decreased range of motion, decreased sensation in the lower and upper extremities, decreased ambulation, pain, and loss of sensation, as well as anxiety and depression. (Tr. 1501–02.) When asked to indicate plaintiff's abilities, he noted that she could never lift or carry anything, even objects under ten pounds, that she could not sit continuously, that she needed to get up from sitting every ten minutes for fifteen minutes, and that she could not walk continuously. (Tr. 1503.) He found that she had significant limitations in doing repetitive reaching, handling, fingering, and lifting, and marked limitations in grasping, turning, twisting, using her fingers and hands for fine manipulations, and using her arms for reaching and overhead reaching. (Tr. 1504.) He opined that she was unable to keep her neck in a constant position, that she was incapable of even "low stress" work, and that she would need breaks every fifteen minutes. (Tr. 1505–06.) When asked what "other limitations" plaintiff had, Dr. Khasidy chose all available limitations: psychological, the need to avoid wetness, noise, fumes, gases, humidity, temperature extremes, dust, and heights, limited vision, and no pushing, pulling, kneeling, bending, or stooping. (Tr. 1507.)

On June 4, 2014, plaintiff was examined by Dr. Tamer Elbaz, who performed an arthrocentesis (aspiration of fluid) and steroid injection in her right knee. (Tr. 1658–64.) He recommended that plaintiff avoid "repetitive forceful, strenuous, twisting, jerky activities" which might aggravate her "lumbar disc displacement"

7

and also to avoid "activities like pulling, bending, lifting, or carrying anything heavy." (Tr. 1662.)

Finally, in September 2014, plaintiff was examined by consultative physician Dr. Joseph Ha. (Tr. 1741–1745.) Dr. Ha noted that plaintiff's gait was antalgic, that she was unable to walk on heels and toes, and that she walked with a cane. (Tr. 1743.) He found her hand and finger dexterity clumsy, but noted that she had full strength in both hands. (Id.) He noted limitations in her upper extremities as well as in her cervical spine, mild tenderness in her lumbar spine, but no spasm, positive SLR, and limitations in her lower extremities. (Tr. 1743–44.) He opined that she had "marked limitations" in heavy lifting, squatting, kneeling, crouching, stair climbing, walking long distances, standing long periods, sitting long periods, and using her hands for fine/gross manual activities. (Tr. 1744.) He noted that she reported difficulty with daily activities such as cooking, cleaning, laundry, and shopping. (Tr. 1742.)

He opined that she could frequently lift and carry items up to ten pounds, and could occasionally reach overhead, handle, finger, feel and push and pull objects with both hands. (Tr. 1746–48.) He recommended that she never climb ladders or scaffolds, balance, stoop, kneel, crouch, crawl, or be exposed to heights, moving mechanical parts, humidity, wetness, dust, odors, fumes, extreme cold or heat and vibrations. (Tr. 1749–50.) He stated that she could sit for a total of 120 minutes per workday, stand for 60 minutes per workday, and walk for 60 minutes per workday. (Tr. 1747.) Finally, he opined that she could shop, travel alone, use

8

public transportation, prepare meals, sort, handle, and use paper and files but could not walk far without a cane.  (Tr. 1751.)

> b.  <u>Plaintiff's Mental Health</u>

Plaintiff was examined by several mental health professionals during the relevant period.  The Court will discuss each in turn.

First, on August 10, 2010, plaintiff was examined by consultative psychiatrist Dr. Dmitri Bougakov.  (Tr. 567–71.)  Dr. Bougakov diagnosed plaintiff with depressive and anxiety disorders, current opioid dependence, and cocaine dependence in remission.  (Tr. 569–70.)  Plaintiff reported that she performed household chores by herself on a daily basis, that she was capable of traveling alone but preferred to go with someone else because she was "uncomfortable by herself around people," that she spent little time with friends, but had a good relationship with her family, despite "often get[ting] into fights because of her moods."  (Tr. 569.) She reported that on a typical day, she watched television and took care of her household.  (<u>Id.</u>)  Dr. Bougakov noted that she appeared her stated age, was sufficiently groomed, significantly overweight, and that she made appropriate eye contact.  (Tr. 568.)  He further reported that her speech was fluent, her language was adequate, her thought processes were "coherent and goal directed," that she was well-oriented, and that her attention and concentration were "intact for counting, simple calculations, and serial 3s."  (<u>Id.</u>)  He found her affect to be anxious and her mood to be depressed.  (<u>Id.</u>)  Dr. Bougakov noted that her recent and remote memory skills were mildly impaired, due to depression, her intellectual functioning

was average, her general fund of information was somewhat limited, and that her insight and judgment were "fair." (Tr. 569.)

Dr. Bougakov opined that plaintiff could follow and understand simple directions, perform simple tasks, maintain attention and concentration, and maintain a regular schedule. (Id.) He found her limited in her ability to learn new tasks and perform complex tasks. (Id.) He further opined that she was able to make appropriate decisions, relate adequately with others, and deal with limited stress. (Id.)

On September 27, 2010, state agency psychologist Dr. L. Blackwell reviewed plaintiff's medical health records. (Tr. 575–81, 588–91.) Based on his review, he found that plaintiff could follow simple directions and make simple work-related decisions; furthermore, her ability to complete a normal week would be "only moderately limited by her depression and anxiety." (Tr. 590.) In sum, he found that she had "the ability for simple work in which she will not work closely with others." (Id.)

Psychiatrist Dr. Sharon Batista treated plaintiff on a monthly basis from May through December 2012, and again from September 2013 through April 2014. (Tr. 1509–38.) Throughout the relevant period, she filled out various questionnaires. First, at two points in 2011, she filled out two forms indicating that plaintiff was unable to work for at least twelve months, finding her anxious and depressed. (Tr. 1169, 1174–75.) Then, in March 2012, she completed a form in which she found no limitations in plaintiff's abilities to understand and remember

one or two instructions, to carry out simple instructions, and to be aware of normal hazards and take appropriate precautions. (Tr. 1255–58.) She found only one mild limitation—plaintiff's ability to interact appropriately with the general public—and also found her capable of tolerating low levels of stress. (Id.) She was unable to assess any further limitations. (Id.)

In September 2013, Dr. Batista filled out a "Treating Physician's Wellness Report" in which she diagnosed depression and PTSD. (Tr. 1437.) She reported that plaintiff had not received psychiatric care in nine months and that she had been "taking high doses of benzos [benzodiazepines] which she has been buying on street." (Id.) She determined that plaintiff was unable to work for at least twelve months. (Tr. 1438.)

On December 23, 2013, Dr. Batista filled out another questionnaire. (Tr. 1491–99.) She diagnosed plaintiff with PTSD, and moderate to severe major depression. (Tr. 1491.) She found that plaintiff had "difficulty coping with stressors" and remained at "chronic low function." (Id.) She noted the following positive clinical findings: mood disturbance, emotional lability, substance dependence, panic attacks, persistent irrational fears, anxiety, psychomotor agitation/retardation, paranoia or inappropriate suspiciousness, and difficulty thinking and concentrating. (Tr. 1492.)

Dr. Batista found no limitations in plaintiff's understanding and memory or in her abilities to carry out even detailed instructions, to ask simple questions and request assistance, to maintain socially appropriate behavior, to be aware of normal

hazards, and to travel to unfamiliar places and use public transportation.  (Tr. 1494–97.)  She found a mild limitation in setting realistic goals.

She found the following moderate limitations:[7] 1) maintaining attention and concentration for extended periods; 2) maintaining regular attendance and being punctual; 3) sustaining an ordinary routine without supervision; 4) working in coordination with others without distraction; 5) making simple work-related decisions; 6) accepting instructions and responding appropriately to criticism; 7) getting along with co-workers; and 8) responding appropriately to changes in the work setting.  (Tr. 1495–97.)

Finally, she assessed the following marked limitations:[8] 1) the ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and 2) the ability to interact appropriately with the general public.  (Tr. 1496.)

She further noted that plaintiff was likely to miss work more than three times a month, but that she could tolerate low levels of stress in her work environment. (Tr. 1498–99.)

### 3. Expert Opinions

Three experts testified at the June 2014 hearing.  The Court will review each in turn.

---

[7] On this questionnaire, a moderate limitation is a limitation that significantly affects but does not totally preclude the individual's ability to perform the activity.  (Tr. 1494.)

[8] A marked limitation effectively precludes the individual from performing the activity in a meaningful manner.  (Id.)

### a. Dr. Malcolm Brahms

Dr. Malcolm Brahms, a medical expert, reviewed all of the records, save three exhibits (50F, 51F, and 52F—Dr. Elbaz's report), which the ALJ read to him over the phone during the hearing. (Tr. 78–90.) Based on his review of the entirety of patient's records, he stated that plaintiff's significant medical issues were a right knee meniscus tear and bilateral carpal tunnel syndrome. (Tr. 91.) He did not find the MRIs of plaintiff's cervical spine to be remarkable, based on the lack of nerve root compression. (Id.) He noted that plaintiff had not received treatment for carpal tunnel syndrome. (Tr. 92.) Dr. Brahms concluded that plaintiff could perform light activity and would be able to perform medium activity if the carpal tunnel syndrome and knee problem were corrected. (Id.)

### b. Dr. Chukulmeka Efobi

Dr. Chukulmeka Efobi, a medical expert, reviewed the medical evidence and assessed plaintiff's condition on August 8, 2011. He reviewed additional evidence and testified at the June 19, 2014 hearing. In his 2011 assessment, Dr. Efobi assessed a depressive disorder, an anxiety disorder, a psychotic disorder based on plaintiff's grief reaction, opioid dependence, and cocaine abuse. (Tr. 1148.) He testified to explain these findings in the 2014 hearing.

Dr. Efobi concluded, based on his review of the record, that plaintiff was able to work, and noted that while his conclusion differed from Dr. Batista's, that many of her findings supported his conclusion—such as the fact that she was capable of low stress work, no limitations on many tasks, and was able to perform the chores

and activities of daily living.  (Tr. 111–21.)  He opined that she would be capable of unskilled work that does not require being with a large number of strangers.  (Tr. 118–19, 1152.)

    c.  Vocational Expert Yaakov Taitz

The ALJ asked vocational expert ("VE") Yaakov Taitz to consider a hypothetical individual of plaintiff's age, education, and work experience, with an inability to read English and a residual functional capacity for sedentary work limited to routine, repetitive tasks, with only occasional decision-making, no changes in the work setting, and occasional contact with co-workers and the public. (Tr. 127–29.)  Taitz named four such jobs: addresser, document preparer, sack or bag repairer, and surveillance system monitor.  (Tr. 129–30.)

When asked what jobs might exist for a hypothetical individual who was off task ten percent or more of the time or had two or more unexplained absences a month, the VE stated that no such jobs would exist.  (Tr. 132.)

II.    APPLICABLE LEGAL PRINCIPLES

    A.  Judgment on the Pleadings

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "The same standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss applies to Fed. R. Civ. P. 12(c) motions for judgment on the pleadings."  Bank of N.Y. v. First Millennium, Inc., 607 F.3d 905, 922 (2d Cir. 2010) (citation omitted).  Therefore, "[t]o survive a Rule 12(c) motion, the complaint 'must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face.'" Id. (quoting Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010)).

B. The Disability Standard

The Commissioner will find a claimant disabled under the Act if he or she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A). The disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3).

The Commissioner uses a five-step process when making disability determinations. See 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in [Appendix 1]. If the claimant has a listed impairment, the Commissioner will consider the claimant disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity. Assuming the claimant does

> not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (citation and footnote omitted); see also Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998). The claimant bears the burden of proof in steps one through four, while the Commissioner bears the burden in the final step. Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012).

C. Review of the ALJ's Judgment

The Commissioner and ALJ's decisions are subject to limited judicial review. The Court may only consider whether the ALJ applied the correct legal standard and whether his or her findings of fact are supported by substantial evidence. When these two conditions are met, the Commissioner's decision is final. See Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) ("We set aside the ALJ's decision only where it is based upon legal error or is not supported by substantial evidence." (citation omitted)); 42 U.S.C. § 405(g).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted). If the

Commissioner and ALJ's findings as to any fact are supported by substantial evidence, then those findings are conclusive. 42 U.S.C. § 405(g); Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995).

While the Court must consider the record as a whole in making this determination, it is not for this Court to decide de novo whether the plaintiff is disabled. See Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Beauvoir v. Chater, 104 F.3d 1432, 1433 (2d Cir. 1997); Veino, 312 F.3d at 586 ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."). The Court must uphold the Commissioner's decision upon a finding of substantial evidence, even when contrary evidence exists. See Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." (citation omitted)); see also DeChirico, 134 F.3d at 1182-83 (affirming an ALJ decision where substantial evidence supported both sides).

Finally, it is the function of the Commissioner, not the Court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (quoting Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)) (internal quotation mark omitted); see also Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995) ("Deference should be accorded the ALJ's [credibility] determination because he heard plaintiff's testimony and

observed his demeanor." (citations omitted)).  An ALJ's decision on credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  Soc. Sec. Ruling 96–7p, 61 Fed. Reg. 34484.

D.  The Treating Physician Rule

"[T]he treating physician rule generally requires deference to the medical opinion of a claimant's treating physician," although an ALJ need not afford controlling weight to a treating physician's opinion that is "not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (citations omitted); see also Burgess, 537 F.3d at 128.  An ALJ who does not accord controlling weight to the medical opinion of a treating physician must consider various factors, including "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; [and] (iv) whether the opinion is from a specialist." Halloran, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)). After considering these factors, the ALJ must "comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Id. at 33.

Although the ALJ will consider a treating source's opinion as to whether a claimant is disabled or able to work, the final responsibility for deciding those issues is reserved to the Commissioner, and the treating source's opinion on them is

not given "any special significance." 20 C.F.R. § 416.927(d)(3); see also Soc. Sec. Ruling 96-5p, 1996 WL 374183, at *3 (July 2, 1996); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). When a finding is reserved to the Commissioner, "the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative." Snell, 177 F.3d at 133. It is the ALJ's duty, as the trier of fact, to resolve conflicting medical evidence. See Richardson, 402 U.S. at 399.

E.  The ALJ's Duty to Develop the Record

Although "[t]he claimant has the general burden of proving that he or she has a disability within the meaning of the Act," "the ALJ generally has an affirmative obligation to develop the administrative record." Burgess, 537 F.3d at 128 (citations and internal quotation marks omitted). SSA regulations require an ALJ to "inquire fully into the matters at issue and . . . receive in evidence the testimony of witnesses and any documents which are relevant and material to such matters." Id. (quoting 20 C.F.R. § 702.338). "In light of the ALJ's affirmative duty to develop the administrative record, 'an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.'" Id. at 129 (citation omitted); see also Calzada v. Astrue, 753 F. Supp. 2d 250, 277 (S.D.N.Y. 2010) ("If the ALJ is not able to fully credit a treating physician's opinion because the medical records from the physician are incomplete or do not contain detailed support for the opinions expressed, the ALJ is obligated to request such

missing information from the physician." (citing <u>Perez v. Chater</u>, 77 F.3d 41, 47 (2d Cir. 1996)).

## III.  DISCUSSION

Plaintiff makes two arguments: first, that the ALJ violated the treating physician rule by failing to grant controlling weight to her treating physicians, and second, that the ALJ failed to sustain his burden at the fifth step of his evaluation process.  In contrast, the defendant argues that the ALJ's decision is supported by substantial evidence, and that he did not violate the treating physician rule.

### A.  <u>The ALJ's Decision</u>

The ALJ evaluated plaintiff's claim pursuant to the five-step sequential process and concluded that plaintiff was not disabled within the meaning of the Act between July 10, 2010 and April 7, 2015.

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since the application date.  (Tr. 20.)  At step two, he determined that plaintiff had severe impairments consisting of degenerative disc disease of the lumbar and cervical spines, partial right knee ACL tear, obesity, anxiety disorder, depressive disorder, PTSD, psychotic disorder, and opioid dependence (on methadone).  (Id.)  The ALJ determined at step three that none of plaintiff's impairments, nor any combination of these impairments, was of a severity to meet or medically equal one of the listed impairments in Appendix 1 of the regulations.[9] (Tr. 21–24.)

---

[9] The ALJ considered and rejected Listings 1.00, 12.00, and SSR 02-1p.  (Tr. 21–22.)

Before proceeding to step four, the ALJ determined that plaintiff had the residual functional capacity ("RFC") to perform less than the full range of "sedentary work" as defined in the regulations.[10]  (Tr. 24.)  He specified that he found plaintiff could occasionally lift or carry ten pounds, and frequently lift or carry less than ten pounds, and that she could sit for up to six hours and stand/walk for up to two hours with normal breaks.  (Id.)  He further concluded that she should be "limited to routine repetitive low stress tasks involving only occasional decision making and no changes in work setting" and "limited to occasional contact with coworkers."  (Id.)

In making this finding, the ALJ considered plaintiff's symptoms, objective medical evidence, and other evidence, including opinion evidence.  (Id.)  He reached his RFC by considering the medical evidence, plaintiff's ability to engage in a variety of daily activities, the level of care she has sought and received, and the credible aspects of the medical evidence.  (Tr. 29–30.)

The ALJ further explained the weight he accorded various medical opinions. He noted that he was giving "substantial weight" to the opinions of Drs. Lathan and Brahms, "significant weight" to the opinions of Drs. Bougakov, Efobi, and Blackwell, and "little weight" to Drs. Rosenberg, Hecht, Khasidy, and Ha and also to Dr. Batista's March 2012 and December 2013 statements. (Tr. 27–29.)

---

[10] 20 CFR 404.1567(a) defines sedentary work as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."

Based on plaintiff's RFC, the ALJ concluded at step four that plaintiff had been unable to perform her past and relevant work. (Tr. 30.)

At the fifth and final step, based on his review of the entire record, including the testimony of the VE, the ALJ determined that there were "jobs that exist in significant numbers in the national economy" that plaintiff could perform, such as addresser, document preparer, stock preparer, and surveillance system monitor. (Tr. 30–31.) He thus found that she was not disabled under the Act and denied her claim. (Tr. 31.)

B. The Treating Physician Rule

Plaintiff argues that the ALJ erred when he failed to give controlling weight to Drs. Batista, Khasidy, Hecht, Elbaz, and Physicians' Assistant Rosenberg; more specifically she maintains that giving "substantial weight" to the opinion of Drs. Bougakov and Lathan, who examined plaintiff only once, and substantial or significant weight to the opinions of doctors who had never examined plaintiff, was in error. She states that the opinions of the treating physicians should be binding upon the ALJ.

However, a treating source's opinion as to the ultimate conclusion of whether a claimant is disabled "cannot itself be determinative." Snell, 177 F.3d at 133. Indeed, "[t]he opinion of a treating physician is not binding if it is contradicted by substantial evidence." Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983). In his consideration of the record, the ALJ must "comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 33.

Here, the ALJ comprehensively set forth the reasons he did not rely on the treating physician's opinions.

The ALJ accorded little weight to Dr. Batista's August 2011, October 2011, and September 2013 opinions that plaintiff could not work as they were conclusory and failed to provide a function-by-function assessment of plaintiff's abilities. (Tr. 28.) He accorded little weight to her December 2013 opinion that plaintiff had a marked limitation in completing a normal workday or workweek and was likely to be absent for more than three times a month for several reasons: first, he found that it was contradicted by several other opinions, including Dr. Bougakov's; and second, because it was inconsistent with her own treatment notes, which indicated an ability to work in a low stress environment, carry out simple tasks, and attend to the tasks of daily living. (Tr. 28–29.)

Similarly, the ALJ accorded little weight to Dr. Khasidy's 2014 opinion, as it was contradicted by plaintiff's own report of her daily activities as well as the "lack of significant abnormalities reflected in examinations and diagnostic imaging." (Tr. 27.)

The ALJ reported that he did not accord controlling weight to Dr. Hecht's or Dr. Rosenberg's opinions, as they did not provide a function-by-function assessment of plaintiff's retained abilities.[11] (Id.)

---

[11] While the ALJ failed to note the weight that he gave to Dr. Elbaz, who examined plaintiff once in June, 2014, the Court notes that the ALJ's RFC is not in conflict with Dr. Elbaz's restrictions, which advised plaintiff to avoid pulling, bending, lifting, carrying anything heavy, and repetitive forceful, strenuous, twisting, jerky activities. (Tr. 1662.)

In contrast, the ALJ stated that he gave more weight to the opinions of Drs. Lathan, Brahms, Bougakov, Efobi, and Blackwell because they were more consistent with the evidence presented—such as the conservative level of care provided, and plaintiff's ability to engage in daily tasks. (Tr. 27–28.)

The ALJ clearly stated which opinions he credited and why; furthermore, he pointed to places in which the treating physicians' opinions were not consistent with other evidence in the record. The Court therefore finds that the ALJ did not violate the treating physician rule.

C. Vocational Testimony/Step Five

Plaintiff's second argument is that the ALJ erred in showing that the plaintiff could perform jobs in the national economy. She claims that the ALJ ignored testimony favorable to the plaintiff, such as the VE's statement that a hypothetical individual who was off task more than ten percent of the day would be unsuited for any jobs in the national economy.

However, at step five, the ALJ had already determined without error an RFC for plaintiff that did not incorporate such a limitation, as he gave little weight to Dr. Batista's 2013 opinion that such limitations were appropriate. He appropriately provided a hypothetical incorporating the limitations he had determined before step four, and the VE answered clearly, giving four examples of sedentary jobs that fit the limitations the ALJ had determined applied.

In sum, having considered the entire record, the Court finds that the decision of the ALJ was supported by substantial evidence, and that he did not err in the

weight he gave to plaintiff's treating physicians.  As such, the plaintiff's motion is DENIED and the defendant's motion is GRANTED.

IV.    CONCLUSION

For the reasons discussed above, plaintiff's motion for judgment on the pleadings is DENIED and defendant's cross-motion for judgment on the pleadings is GRANTED.

The Clerk of Court is directed to terminate the motions at ECF Nos. 13 and 19 and to terminate this action.

SO ORDERED.

Dated:    New York, New York
          January 11, 2018

_____
        KATHERINE B. FORREST
        United States District Judge